**In the Matter of Arnold DRESDEN, Respondent.**

United States District Court
S. D. New York.
June 24, 1959.

Arthur H. Christy, U. S. Atty., New York City, for petitioner. William S.

Ellis, Asst. U. S. Atty., New York City, of counsel.

Frank L. Miller, New York City, for respondent.

**FREDERICK van PELT BRYAN, District Judge.**

The Government moves to punish respondent in civil contempt for failure to obey an order of Judge Cashin dated June 10, 1958. This order directed respondent to appear before a Special Agent of the Internal Revenue Service on a specified date to answer questions concerning the tax liability of and the collection of taxes from six named corporations,[1] and to produce all books and records of such corporations for examination.

Dresden has produced a substantial volume of books and records of the corporations in question for the Internal Revenue Service. He insists that he has produced all which are available to him and that he has been unable to locate any others despite thorough search.

The Government, on the other hand, while admitting that it has received most of the books and records which it desires, alleges that other crucial records under Dresden's control were not produced.

There was no substantial conflict in the testimony adduced at the hearing, and the only real dispute is as to the inferences to be drawn from the undisputed evidence. I find the following to be the facts as established by the record:

The six corporations in question were engaged in contract clothing manufacturing in Northern New Jersey. They were successively organized, apparently to succeed one another in this business, and each was in business for about a year. None of them are now in business and one, A. D. Valentine & Company, is in bankruptcy in this court.

Respondent Dresden, a member of the bar who is not practicing, was an officer

[1]. The corporations are Dante Fashions, Inc., Janie, Inc., Bonnie Tweed Corporation, Rosen De Mille, Inc., Gary Ross Corporation, and A. D. Valentine & Company.

of all six corporations and appears to have controlled them.

In the spring of 1958 Special Agent Goldstein of the Internal Revenue Service, before whom Judge Cashin's order directed Dresden to appear, was carrying on an investigation into the withholding and social security tax liabilities of these six corporations. Goldstein met Dresden at the factory of Bonnie Tweed Corporation in Garfield, New Jersey, on March 24, 1958. There were apparently no operations going on and Dresden was the only one there.

Goldstein asked to see the corporate books and records of the six corporations. Dresden told him that he had virtually none on the premises but would send some over later that day. He invited Goldstein to look around and Goldstein found the payroll book of Bonnie Tweed Corporation and took it with him.

Some time later, pursuant to Dresden's directions, one of his employees delivered a package of records to Goldstein at the Dante Fashions, Inc. office in Paterson, New Jersey, consisting of the general journal, general ledger, cash book and two checkbooks of that corporation.

Subsequently Goldstein telephoned Dresden and requested that he appear at the Internal Revenue Office in Newark on April 14, 1958 and bring with him all records of the corporations which had not been produced up to then. Dresden appeared on that date without any records and his testimony was taken by Agent Goldstein.[2]

Thereupon Goldstein served an Internal Revenue Service summons upon Dresden requiring him to appear at the office of the Service on May 1, 1958 with "all corporate books & records of the [six] corporations including cancelled checks, bank statements and payroll records". It is undisputed that Dresden failed to appear or to produce any records on that date, but there is dispute as to whether he communicated with Goldstein to inform him that he could not be there.

Upon Dresden's non-appearance on May 1 the United States Attorney for New Jersey informed him by letter that he could be punished for contempt for his failure to comply with the Internal Revenue Service summons.

On June 10, 1958, upon the application of the United States Attorney for this district, Judge Cashin of this court issued an order directing that Dresden

"* * * appear before Special Agent Jacob Goldstein * * * at 1:00 P.M., June 16, 1958, to answer questions relating to the tax liability and/or the collection of the tax liability of [the six corporations] and bring with him and produce for examination all corporate books and records of the aforementioned corporations, including cancelled checks, bank statements and payroll records * * *."

Whether or not Dresden disobeyed this order is the issue to be determined here.[3]

Judge Cashin's order was served upon Dresden and it was agreed by telephone that the return date would be postponed by one day to June 17, 1958.

On June 17 respondent appeared at the Newark office of the Internal Revenue Service. He brought with him the employee earning records of Janie, Inc. and

---

2. The following were among the questions asked respondent on April 14th:

"46. Q. Do you have the books and records of Janie, Inc.? A. I'm looking for them at the present time.

"47. Q. Do you have the books and records for Gary Ross? A. The answer is the same for both.

"48. Q. Would that apply to Rosen De Mille? A. No. Rosen De Mille records I have already located.

"49. Q. How about the records for Bonnie Tweed? A. The only records for Bonnie Tweed that I presently have are the payroll records from October 1957 to date. The previous records, I can get. They are not in my possession, but I can get them.

"50. Q. Do you have the books and records for A. D. Valentine & Co.? A. I can get those records although they are not in my control at the present time."

3. The procedure which was followed is authorized by 26 U.S.C. §§ 7602–7604.

the payroll journal of Dante Fashions, Inc. Goldstein again asked for all the corporate records of the six corporations which he had not yet received. Dresden said that he would try to find them.

On July 30, 1958 Dresden produced six cartons of records. These included the time cards, price cards, cancelled checks, and bank statements of Dante Fashions, the time and price cards of Gary Ross and Janie, the payroll checks, W-2d's for 1956 and employee earning records of Gary Ross, and cancelled checks, bank statements, time cards and copies of sales invoices of Rosen De Mille. He announced that he had no further records of the corporations and at a subsequent appearance at the office of the United States Attorney on August 12, 1958 again maintained that he had no further records.

The Government contends that the records which Dresden produced were not complete and that some important records were never produced, that many of the employee earning records and time cards which were produced contained no addresses for the employees, and that these addresses were necessary in order for it to pursue its investigation of the withholding tax liabilities of the six corporations.[4]

However, in addition to the records produced by Dresden, the Service obtained a number of records from other sources. Mehr, an officer of Gary Ross and Janie, turned over two volumes of large payroll sheets of these corporations, apparently on Dresden's instructions. Records of A. D. Valentine, which was in bankruptcy in this court, and of Bonnie Tweed, were received from the accountant for the creditors committee of these corporations. Missing bank statements of Dante Fashions were obtained directly from Manufacturers Trust Company. The payroll records of Dante Fashions for 1957 and 1958 were obtained shortly before the contempt hearing from Mrs.

---

4. It is contended that the following records were never produced by the respondent:

"Dante Fashions, Inc.
1. Original and duplicate Form 941—4Q 1957 and 1Q 1958
2. Original and duplicate Form 940 for 1957
3. Minute Book
4. Stock Certificate Book
5. W-2 d for 1958 (Withholding Statements)
6. Bank statements and Cancelled Checks: Manufacturers Trust Co.—Aug. 1957 and Oct. 1957—Chemical Corn Exchange Bank—July 1957
7. Copy of Income Tax Return for 1958
8. Copy of Income Tax Return for 1957

"A. D. Valentine Co., Inc.
1. Minute Book
2. Stock Certificate Book
3. W-2 d for 1956, 1957, 1958
4. Duplicate Forms 941—3 and 4Q 1956, 2Q, 3Q 1957, 1Q 1958
5. Duplicate Form 940 for 1956 and 1957
6. Copies of Income Tax Returns for 1957 and 1958

"Bonnie Tweed Corp.
1. W-2 d for 1957 and 1958
2. Duplicate and Original Forms 941—1st Q 1958

3. Form 1120, Income Tax Returns for 1957 and 1958

"Rosen De Mille, Inc.
1. Minute Book
2. Stock Certificate Book
3. W-2 d for 1956 and 1957
4. Duplicate Form 941—3Q 1956, 1Q, 2Q, 3Q 1957

"Gary Ross Corp.
1. Copies of W-2 d for 1957
2. General Journal
3. General Ledger
4. Cash Book
5. Cancelled Checks
6. Bank Statements
7. Accounts Receivable Ledger
8. Accounts Payable Ledger
9. Minute Book
10. Stock Certificate Book
11. Copy of Income Tax Return for 1956 and 1957 (Form 1120)

"Janie, Inc.
1. Copies of W-2 d, 1956
2. General Journal
3. General Ledger
4. Cash Book
5. Cancelled Checks
6. Bank Statements
7. Minute Book
8. Stock Certificate Book
9. Accounts Receivable Ledger
10. Accounts Payable Ledger."

Weinstein, the bookkeeper who had taken them home in April 1958, with respondent's knowledge, to work on them.

Moreover, some of the records which the Government claims to be missing may never have been in existence, such as income tax returns for 1958, which were not due until April 15, 1959, and 1957 returns for a number of the corporations which do not seem to have ever been prepared. The Government did not show that it had fully exhausted the possibilities of obtaining records from the trustee in bankruptcy of A. D. Valentine, and the stock certificate books and minute books of various of the corporations, which seem to have been pro forma at best appear to be in the hands of the attorney who organized these corporations who is not now practicing in New York but is teaching in Florida.

Other sources of information were available to the Government from which it could have obtained much of the missing data though not without some trouble and expense. Dresden offered to obtain missing addresses of employees from the International Ladies Garment Workers Union, who were said to have them in connection with payments to the Employees Welfare Fund. While the Government made inquiries at the I.L.G.W.U. office in New York for these addresses without success, no similar inquiry was made of the local which covered the employees in question. The social security numbers of the employees were listed and their addresses could have been obtained from the Social Security Board. The bank statements for the few missing months were secured from one bank but no effort was made to secure them from the other.

As late as October 5, 1958 Agent Goldstein made no claim that there was material which had not been produced. As of that time, while all the records of all the corporations had been requested, little or no emphasis had been placed on any specific records. Prior to the contempt motion Dresden had never, for example, been asked specifically for the 1956 and 1957 Gary Ross income tax returns or for a number of other records of Rosen de Mille, Inc. now specified by the Government.

Agent Goldstein said that he had met with Dresden at least ten times and that some records were produced each time, and that he also had numerous conversations with Dresden on the subject of the records dealing largely with Dresden's efforts to find those which were missing. It is highly significant that on cross-examination Goldstein described the respondent as "cooperative".

Dresden testified on his own behalf that he did his utmost to comply with the court's order.

There came a time when whatever activities there were of these corporations were carried on from the Garfield, New Jersey, address and such records as there were had been moved there from the various former premises of the corporations.

At the end of April 1958 it was necessary to vacate the Garfield premises because there were insufficient funds on hand to pay the May rent. Dresden made arrangements with the G. & G. Trucking Company in New Jersey to remove all equipment and records from the premises. The records were taken to the truckman's premises and left in the truckman's van pending further disposition. Dresden claims that he went to these premises eight or nine times to search for missing records, that such records as there were were piled indiscriminately in the van among tires, filing cabinets, clothing racks and other equipment, but that he finally delivered to Goldstein all the records he was able to find and could find no others.

In addition, Dresden communicated with the accountant for the corporations and with personnel who had been connected with them, searched his home, looked through material in the trunk of his car, and in other places, in an effort to find further records, but to no avail. He tried to locate the attorney who had incorporated the corporations, who had the stock and minute books, but found

344

he was permanently in Florida and did not follow the matter up further.

The missing bank statements and cancelled checks for August and October 1957 of the Manufacturers Trust Company and July 1957 of the Chemical Corn Exchange Bank he was unable to locate and thought to have been lost. As to the records in possession of Mrs. Weinstein, Dresden admitted that he had told her to take them home to work on them, but claims that he had quite forgotten until the hearing that they were in her possession.

Dresden's explanation of his failure to produce the relatively few records which are still missing was not implausible. It is apparent that the affairs of these corporations were in a highly confused state. Dresden's claim that some of the records must have been lost or misplaced during one or more of the corporations' numerous moves is by no means incredible. There is no doubt that he made substantial efforts to locate the records called for, and, indeed, produced a mass of material which was described as being enough to make a pile two feet high, two feet wide and eight feet long.

While it does not appear that Dresden was eager to be of assistance, on the other hand he was, as Agent Goldstein described him, "cooperative". It cannot be said from this record that the Government was seriously impeded in its investigations of the tax liabilities of these corporations, nor that there are any large number of missing records presently unaccounted for which are of any great significance.

It would be difficult, indeed, to determine with any degree of certainty the extent to which Dresden's explanation of his failure to produce such records as are missing is completely true or not.[5] His testimony that he "forgot" about the records in Mrs. Weinstein's possession, that some of the records he claimed to be in the possession of the Valentine trustee

were not in fact there, and that he did not pursue his inquiries about the corporate books in the hands of the attorney who had gone to Florida, casts some doubt as to his complete good faith in the premises.

■ But the burden of proof on the Government to establish that Dresden is guilty of civil contempt is not inconsiderable. Contempt proceedings are sui generis. They are neither civil actions, nor prosecutions for offenses. Myers v. United States, 264 U.S. 95, 103, 44 S.Ct. 272, 68 L.Ed. 577. The burden of proof in such proceedings lies somewhere between the criminal "reasonable doubt" burden and the civil "fair preponderance" burden. The burden to be met has been phrased in terms of "clear evidence" (In re Gordon & Gelberg, 2 Cir., 69 F.2d 81, 83) or "clear and convincing evidence" (Fox v. Capital Co., 3 Cir., 96 F. 2d 684, 686; Oriel v. Russell, 278 U.S. 358, 49 S.Ct. 173, 73 L.Ed. 419).

In my view the Government has not met that burden here.

■■ Quite apart from the affirmative evidence that Dresden not only produced most of the material requested but made substantial efforts to find the rest of it, the Government has failed to establish that the respondent ever had control of the missing records. There is no presumption that he had such control and the Government's reliance on In re Ironclad Mfg. Co., 2 Cir., 201 F. 66, to support such a presumption is misplaced. The Ironclad case merely holds that a corporation is presumed to be in possession and control of its own books and records. But this presumption, as the court stated, does not apply to corporate officers. 201 F. at page 69:

"As to the order finding Mrs. Seaman individually in contempt for not producing books which do not belong to her, we have no presumption of possession. Possession must

5. Cf. United States v. Goldstein, 2 Cir., 105 F.2d 150, 151, where the court indicated that it might have accepted respondent's explanation that the records

were misplaced or lost were it not for the other evidence which showed that the story was a fabrication.

be shown by proof, and it seems to us that the proof to be found in this record does not satisfactorily establish the proposition that at the time the order to produce was served upon her the books were in her custody and control. Her own evidence is very unsatisfactory and seems to indicate that no reliance can be placed on any statement she may make; but, if her testimony be struck out as untrustworthy, there is no other evidence sufficiently convincing to warrant her imprisonment for contempt * * *."

■ Nor does respondent's failure to appear and object to the granting of Judge Cashin's order directing him to produce the corporate books and records create a presumption that he had the records in his possession and control at the time the order was issued. Judge Cashin's order merely required the production of "all corporate books and records" without specifying the particular records desired. Dresden has consistently taken the position that he did not know what records he had or what records he could locate, and that he would try to find as many of them as possible. Throughout Dresden indicated that he did not know with any certainty what records he had and what records were missing. This is in contrast to London Guarantee & Accident Co. v. Doyle & Doak, C.C.E.D. Penn., 134 F. 125, relied upon by the Government, where respondents had contested the application to compel production of specific records without making any claim that the records were not under their control. Nothing which Dresden said or did prior or subsequent to June 10, 1958 gives rise to a presumption that such records as are missing were in his possession or control on that date.

■ On the record as a whole, including Agent Goldstein's estimate that the respondent "appeared cooperative", the failure to establish that the missing records were in Dresden's possession or under his control, the fact that a large volume of records, and, indeed, most of them, were actually produced, and the fact that much of the data sought could have been obtained from other sources, I find that the Government has failed to meet the burden of establishing that Dresden was guilty of civil contempt. Cf. United States v. Bryan, 339 U.S. 323, 330, 70 S.Ct. 724, 94 L.Ed. 884; In re Rivera, D.C.S.D.N.Y., 79 F.Supp. 510, 511.

The motion to punish for contempt is therefore denied.

Settle order on notice.