## In re RIVERA.

District Court, S. D. New York.
July 2, 1948.

John F. X. McGohey, U. S. Atty., of New York City (Roy M. Cohn, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Shearman & Sterling & Wright, of New York City (John A. Wilson and William F. Hamilton, both of New York City, of counsel), for respondents.

COXE, District Judge.

This is a motion by respondents to vacate and set aside a summons issued by a Special Agent of the Bureau of Internal Revenue under the authority of Section 3614 of the Internal Revenue Code, 26 U.S.C.A., and served upon John C. Macy, Assistant Cashier, National City Bank of New York, requiring him to appear to give testimony in the matter of the tax liability of Dr. Luis Rivera or Luis R. Feliciano, and to produce certain books and papers; and also to vacate and set aside an order of this court requiring him to comply with the said summons, issued pursuant to Section 3633(a).

The summons required him to produce

"All accounts with the San Juan, Porto Rico, Branch of the National City Bank of New York pertaining to Dr. Luis Rivera, also known as Luis R. Feliciano, under his name or under whatever names or designations entered, for the years 1942 to 1946, both inclusive, together with deposit tickets relative to the accounts for the same years. Photostats or transcripts of these records will be accepted in lieu of the originals, if more convenient to you."

The motion is made upon the ground that the books and papers are not in the possession, or under the control, of Macy, or of the head or home office of the National City Bank of New York, or of any person or persons in the head or home office, and are not within the State of New York, or the jurisdiction of this court or of the Bureau of Internal Revenue. No objection is made that Macy was not a proper person to be served with the summons on behalf of the Bank.

The National City Bank of New York (hereafter referred to as "the Bank") is a national banking association organized under the laws of the United States, with its principal or home office in the City of New York. In June 1918, it established a branch at San Juan, Porto Rico, as authorized by Section 25 of the Federal Reserve Act, Chap. 6, 38 Stat. 273–274, as amended by the Act of September 7, 1916, Chap. 461, 39 Stat. 755, now Section 601, 12 U.S.C.A. This section provided that national banking associations might obtain authority from the Federal Reserve Board to "establish branches in foreign countries or dependencies or insular possessions of the United States for the furtherance of the foreign commerce of the United States." The Bank now has 48 such branches.

■ It is well settled that a person cannot be compelled to produce, under a subpoena, a document which is neither in his possession nor under his control. The physical location of the document is unimportant. Basically, the test is control. Munroe v. United States, 1 Cir., 216 F. 107; In re National Public Utility Investing Corporation, 2 Cir., 79 · F.2d 302; In re Harris, D.C.S.D.,N.Y., 27 F.Supp. 480; In

re Grand Jury Subpoenas Duces Tecum, D.C.S.D.,N.Y., 72 F.Supp. 1013. And there is a "presumption that a corporation is in the possession and control of its own books." In re Ironclad Manufacturing Co., 2 Cir., 201 F. 66, 68.

Section 604 of the Federal Reserve Act, 12 U.S.C.A., provides as follows:

"Every national banking association operating foreign branches shall conduct the accounts of each foreign branch independently of the accounts of other foreign branches established by it and of its home office, and shall at the end of each fiscal period transfer to its general ledger the profit or loss accrued at each branch as a separate item."

■ The government contends that the moving papers in support of the motion show that the home office of the Bank has general supervision and control over the affairs of the San Juan branch, and, therefore, can obtain and produce the required records. The Bank contends that the San Juan branch is a separate entity and that under the decision in In re Harris, supra, it cannot be compelled to produce any records of the branch.

The By-Laws of the Bank provide that

(1) "The Board of Directors shall have power to manage and administer the business and affairs of the Association,"

(2) "The Board of Directors shall appoint a Cashier, who * * * shall be custodian of the corporate seal, records, documents and papers of the Association,"

(3) "The Board of Directors may appoint a Manager Overseas Division who shall have supervision and control of all foreign branches of the Bank. He shall have general executive powers with respect to said branches,"

(4) "The Board of Directors shall have plenary power to establish, to discontinue, or, from time to time, to change the location of, any branch in a foreign country or in a dependency of the United States of America, subject to such limitations as from time to time may be provided by law,"

(5) "Subject to the general supervision and control of the Board of Directors the affairs of the foreign branches shall be un-

der the immediate supervision and control of the Manager Overseas Division, and subject to such rules and regulations as he shall promulgate from time to time; * * * (who) is authorized to employ at any foreign branch the necessary officers, agents and employees,"

(6) "At each (foreign) branch, the officer, manager, or other agent in charge thereof shall keep or cause to be kept, full and regular books of account, which shall at all times be open to inspection by the Association, through its proper officers or accountants or by the proper officers of the Government of the United States of America. All the transactions of the Association at the several branches shall be reported promptly to the Association by the officer, manager or other agent in charge thereof."

It appears from an affidavit submitted by George F. Nolte, an Assistant Vice-President of the Bank, that, since its establishment in 1918, the San Juan branch has been conducted as a completely separate and independent unit, under the separate management and supervision of an officer, with the title of "Manager"; that the present Manager derives his authority to act from a power of attorney, executed under the authority of the Board of Directors of the Bank, which confers upon him full power and authority to manage, transact and generally conduct a general banking business on behalf of the Bank; that his acts are subject to the approval of the home office only with respect to transactions exceeding certain specified amounts; that the home office does not require its branches to report each specific transaction with a customer, but only general transactions; that neither the Cashier nor the Manager Overseas Division is empowered by the By-Laws to remove original records from the branches, although there are no restrictions with respect to transcripts or photostatic copies; that the home office does not have any list of depositors in the San Juan branch, or any record of transactions or balances in their accounts, the only records of deposits and withdrawals being kept at San Juan; that the San Juan branch maintains "a current account" with the home office, but keeps its own reserves, makes

its own investments and loans without approval by the home office, unless the amount exceeds a certain sum; and that the San Juan branch conducts its business under rules and regulations laid down by the local Porto Rican banking authorities under Title VIII, Section 39, of the Porto Rican Banking Law.

I do not find anything in Section 39 of the Porto Rican Banking Law which prohibits, or imposes any restriction upon, the removal from Porto Rico of the records called for by the summons, or the furnishing of transcripts or photostats thereof. The By-Laws of the Bank show that the Bank has full control over such records, and there is nothing indicating to the contrary in the Nolte affidavit.

█ In re Harris, supra, heavily relied on by the Bank, is readily distinguishable. In that case the branch involved was located in London, England—a foreign country, and it was held that "the fact that by section 604 the accounts of a foreign branch are to be conducted 'independently' of the home office leads to the conclusion that the records of a depositor's account with a foreign branch, not kept here, are not so within the control of the main office here as to be subject to production by subpoena duces tecum' served here." [27 F.Supp. 481.] The branch office in the present case is located in San Juan, Porto Rico—not a foreign country, but an insular possession of the United States. 48 U.S.C.A. Chap. 4. The term "foreign branches" in Section 604 does not include branches in dependencies or insular possessions. See Domenech v. National City Bank, 294 U.S. 199, 206, 55 S.Ct. 366, 79 L.Ed. 857.

█ Finally, the Bank insists that the summons here cannot be upheld, for it was issued under the authority of Section 3614 of the Internal Revenue Code; and Section 734, 48 U.S.C.A., of the Organic Law of Porto Rico provides that the internal revenue laws of the United States (except certain sections not here pertinent) shall not be applicable to Porto Rico. It argues that the Bureau of Internal Revenue has no income tax jurisdiction in Porto Rico, that the summons could not have been served there, and that it should not be al-

lowed to do indirectly what it cannot do directly. But that is not the question. The Bureau is not seeking to enforce any internal revenue law in Porto Rico. It seeks merely to obtain from a corporation here, to whom the internal revenue laws indubitably apply, certain information relative to the accounts of an individual to whom, presumably, the internal revenue laws also apply. There is nothing in the Organic Law of Porto Rico which prohibits this.

The respondents' motion to vacate and set aside the summons and to vacate the order requiring compliance therewith is denied.